IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 5, 2003

## TROY STERLING FULLER v. JANIE MARIE NICHOLSON

**Direct Appeal from the Circuit Court for Wilson County**
**No. 11759    Clara Byrd, Judge**

_____

**No. M2003-00083-COA-R3-CV - Filed May 12, 2004**

_____

This is primarily a child custody dispute.  The father and mother lived together with their infant son and the mother's two older sons in the mother's house trailer before moving into a house purchased by the mother with a down payment provided by the father.  When their son was approximately eight months old, the parties separated and thereafter began a contentious legal battle over his custody.  Following a bench trial, the trial court awarded the mother primary custody, granted the father broad visitation rights, and denied the father's request for the return of his down payment and closing costs, finding there was no equity in the house.  The father appeals the trial court's award of primary custody to the mother and its denial of his request for the return of his down payment and closing costs.  We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed in Part, Reversed in Part, and Remanded**

ALAN E. GLENN, SP.J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and WILLIAM B. CAIN, J., joined.

Brody N. Kane, Lebanon, Tennessee, for the appellant, Troy Sterling Fuller.

Joy L. Davis, Franklin, Tennessee, for the appellee, Janie Marie Nicholson.

**OPINION**

**FACTS**

The parties in this case, Troy Sterling Fuller ("Father") and Janie Marie Nicholson ("Mother"), who were engaged but never married, are the parents of Christopher Tyler Fuller, born October 10, 2000.  Father and Mother lived together with Christopher and Mother's two older sons from a previous relationship in Mother's house trailer on Beckwith Road in Mount Juliet from the summer of 1999 until December 2000, when they moved to a home located on Quarry Road in Mount Juliet, which was purchased by Mother at auction for $237,300, with a $23,730 down

payment provided by Father. During the time that they lived together, Mother earned $65,000 per year as an office manager for a group of physicians at a women's health center. Father, whose 2000 tax return showed a net loss of $34,350, was a toolmaker and mechanical design engineer for American Manufacturing Systems, a corporation whose principal shareholder was his mother.

The parties separated on June 7, 2001. On June 15, 2001, Father filed a petition to establish parentage and an ex parte motion for emergency temporary custody, alleging Mother had refused to allow him contact with the child and had moved without providing a forwarding address and that he feared she would take the child out of state. The trial court granted Father's motion for emergency temporary custody and ordered that Mother appear at a June 28 show cause hearing to demonstrate why Father should not have custody of the minor child and receive child support from Mother.

Mother responded with a motion to set aside the trial court's order. Following a June 18, 2001, emergency hearing, the trial court entered a temporary joint custody order in which Father was awarded custody every other weekend and on the weekdays while Mother was working, and Mother was awarded custody for the remainder of the time. In addition, the trial court ordered that Father make the June 8, 2001, house payment of $5,049, plus penalties, on the Quarry Road property and that Mother be prohibited from selling or refinancing the property pending further orders of the court or agreement of the parties.

On July 12, 2001, Mother filed a motion seeking permission to refinance or sell the property, alleging that Father had failed to comply with the trial court's order to make the June payment, placing her in default on her loan and in imminent danger of losing the property through foreclosure. Mother liquidated the cash in her 401(k) on July 26, 2001, for the purpose of paying the June house note, but did not inform the trial court of her actions. On July 27, 2001, the trial court found Father in civil contempt and ordered him jailed based on his failure to pay the note. However, on July 30, over Mother's objection, the trial court ordered Father's immediate release from jail, finding that he lacked the ability to cure the contempt and that it was in the child's best interest for him to be released from custody. Mother paid the house note on August 2, 2001, with her 401(k) funds. On September 14, 2001, the trial court granted Mother's motion to sell or refinance the property, specifically reserving the issue of whether Father held any interest in the property to the final hearing. Unbeknownst to the trial court at that time, however, Mother had already encumbered the property with a $15,044.55 loan obtained on June 25, 2001, secured by a second deed of trust on the home.

The parties' contentious relationship continued in the months before trial, as evidenced by the motions filed in the case. These included Mother's August 10, 2001, motion for temporary child support and a restraining order, in which she alleged that Father was driving with the child on a revoked driver's license; Mother's September 17, 2001, motion for a restraining order in which she alleged Father was harassing her by repeatedly telephoning her workplace and her parents and badgering her during their daily transfers of custody of the child; and Father's September 20, 2001, motion to alter pendente lite parenting responsibility in which he alleged, *inter alia*, that Mother had attempted several times to hit Father with her car and had once run over his foot, routinely dropped

the child off for visitation with dirty ears and fingernails and without diapers, bottles, toys or proper clothing, and failed to inform Father of the child's illnesses or doctor's visits. On September 21, 2001, the trial court entered an agreed order establishing the paternity of the child and setting the case for trial on December 12, 2001. On October 16, 2001, the trial court entered an order which restrained Father from driving a motor vehicle with the child until he received a valid driver's license, restrained both parties from telephoning the other's place of employment or families and harassing each other, ordered that each parent notify the other within eight hours of the child's visits to a health care provider, and altered the child's visitation with Father to 8:00 a.m. to 2:00 p.m. each weekday while Mother remained on a leave of absence from work.

Trial was held on December 12, 2001, and continued on August 8, 2002, with Father represented by counsel at the first date but proceeding *pro se* at the latter. Mother testified that she still lived at the Quarry Road property with Christopher, who was fourteen months old at the December 12, 2001, trial, and her two older sons from a previous relationship, Michael and Jonathan, who were ten and twelve. She said she and Father, who were planning to marry at the time, had been looking for houses to buy in the Mount Juliet area and mutually decided to bid on the Quarry Road property when it came up for auction in December 2000. They discussed the highest bid they were willing to make and Father filled out the paperwork on their bid and accompanied her to the sale. Father also paid the $23,730 down payment on the property, as well as $2,706 in closing costs, with checks drawn on his company account. Father suggested, however, that it would be in her best interest to have the property titled in her name alone, because of the nature of his business and a lawsuit that was pending against him.

Mother testified she received word on the Monday following the sale that there was a problem with Father's checks, but the problem was eventually resolved by either Father or his mother. Her unwritten agreement with Father with respect to their living expenses on Quarry Road was that she would pay for food, telephone, utilities, and property insurance, and he would be responsible for the house note, which consisted of a $213,570 seven-year loan with an interest payment of approximately $4,900 due every three months and an annual balloon payment of $30,000 due on December 8. According to Mother, Father covered only the first interest payment, due on March 8. She testified her relationship with Father first began to deteriorate during her pregnancy, during which time they argued over his long work hours and his failure to contact her during his frequent out of town business trips. She said she left to stay with friends on Thursday, June 7, 2001, following a heated argument. Father and his belongings were gone when she returned to the house on Saturday, June 9.

Mother testified that she initially sought to refinance the home, but was told by her banker that she would need to reduce her debt ratio in order to qualify. Therefore, she took out the $15,044 loan on June 25, 2001, using the house as collateral, in order to pay off approximately $10,000 in credit card debt and to pay her attorneys' fees. In addition, she traded in her two vehicles, with total monthly notes in excess of $1,000, for a Cadillac Escalade with a monthly note of $833. Mother testified she filed her initial loan application on June 13. She said she was distraught at the June 18 emergency hearing and did not recall the trial court's ordering her not to encumber the property. In

-3-

addition, the initial draft of the trial court's order, which her counsel faxed to her on July 2, did not contain any prohibition against encumbering the property, although the second draft, faxed to her on July 5, did. Mother later refinanced both loans for $245,000, so that at the time of trial she had a standard thirty-year mortgage with a monthly note of $2,200. She testified that the property appraised for $275,000, at the time of refinancing. Mother acknowledged that she had since taken out additional unsecured loans in order to purchase Christmas presents for her children and conceded that she was heavily in debt.

Mother testified she and Father never had an agreement for her to pay back the down payment but, nonetheless, acknowledged at trial that something needed to be "worked out" in that respect, with any judgment awarded to Father offset by money he owed her. According to Mother, Father owed her $4,800 for six months unpaid rent during the time they lived on Beckwith Road, under their verbal agreement that he pay $800 per month for living expenses. She also insisted that Father owed her at least $1,500 for her Appaloosa mare that had died of a ruptured stomach after the co-op mistakenly sold Father medicated, instead of sweet, feed, and Father poured the entire fifty-pound bag in the horse's feed trough at one time.[1]

Mother acknowledged that Father was a good father at times. She said he began taking their son to his shop four days per week in January 2001, while she was at work, and she initially had no problem with the arrangement. However, as the child approached crawling age, she began to fear for his safety because of the metal shavings that were carried from the work area into the shop's office on the shoes of the shop employees. In addition, she had seen the child in the shop area with the machinery, being watched by the employees, while Father conducted business in the office. Mother conceded the child had never been injured while in Father's care. She acknowledged Father changed the child's diapers when he was in his care and frequently took him to his doctor's appointments, but said she was the one who daily fed, bathed, and dressed him.

Mother testified her two older sons liked Father in the beginning, until he started disciplining them in a manner that neither they, nor she, approved. As an example, she related a summertime incident, essentially corroborated by Father's testimony, in which Father punished Michael by spraying him with a water hose after forcing him to strip to his underwear.[2] Mother explained that Michael had complained that it was not fair having an older brother who picked on him, and Father had responded by spraying him in the face with water until he could no longer say the words, "It's not fair." According to Mother, Father also hit the boys in the chest and arms with his fist, telling them that they needed to stop being wimps and to toughen up, and wrestled with them, despite knowing that Mother disapproved of roughhousing. However, Mother acknowledged she did not report Father's actions to the police or the Department of Children's Services, and she trusted him to care for the children during her absences, including when she was away overnight.

---

[1] Mother referred to Father as having "killed" her horse, implying that he deliberately overfed the animal with knowledge of the health risks associated with giving a horse unfettered access to grain. She provided no additional proof, however, and Father did not offer any testimony on the issue.

[2] Father testified that Michael was throwing a fit, and he sprayed him with a water hose to cool him down.

Mother conceded that Father placed an emphasis on education and frequently drove one of her sons to his tutoring sessions during the time he lived with the family. She acknowledged both boys had better attendance records, with fewer absences and tardy arrivals, and that Jonathan earned better grades during that time. However, she attributed these differences to the influence of a tutor, which the school no longer provided, and the fact that the boys formerly rode the school bus.

Mother testified that she was afraid of Father. She described an incident that occurred during an argument in which she retreated to the bathroom, and Father followed her, kicked in the bathroom door, and told her that the discussion was not over. During that same argument, Father followed her to the laundry room, where she had gone to telephone the sheriff's department, and punched a hole in the wall with his fist, saying, "I'll show you whose damn house this is." She asked him to leave the house, and he complied. Mother testified that Father had threatened her and her family, harassed her by repeatedly calling her workplace, and badgered her during their daily transfers of the child. She also claimed that Father was responsible for the loss of her job, explaining that he had caused her to be arrested on a charge of falsifying a government document by signing a warrant stating that she had listed them as married on the child's birth certificate. Mother admitted having told coworkers that they were married, but denied having supplied the information for the birth certificate and said the charge was later dismissed. She testified, however, that the stress caused by the accusation and arrest precipitated her request for a leave of absence from work, which lasted two or three weeks. Because stress continued to prevent her from fulfilling her management responsibilities, her employers placed her on a second, sixty-day leave of absence when she returned to work, with the suggestion that she use the time to find another position.[3] Mother testified there had been no discussion of her returning to work at the same place, and denied having taken the leave of absence in an effort to limit Father's time with the child.

Mother denied hitting or attempting to hit Father with her car or withholding any of the child's medical information from him. As for Father's allegation that she had dropped the child off for visitation without proper clothing, she explained that the child had soiled his pants during the drive, and she had opted to bring him to Father dressed only in a clean diaper and t-shirt, rather than returning home for additional clothing. Mother acknowledged she had disobeyed the trial court's order awarding emergency temporary custody to Father, but said she had done so at the advice of the lawyer who was representing her at that time.[4]

Father's December 7, 2001, deposition was admitted as an exhibit at trial, and Father additionally testified at the August 8, 2002, continuation of the trial. He testified he paid the down payment and closing costs on the Quarry Road residence with checks drawn on the capital account of American Manufacturing Systems, having negotiated an agreement with his mother to receive a reduced draw and commission in exchange for a loan. Father requested that the trial court award him

---

[3] It appears, based on a comment made by Mother's counsel, that Mother had secured employment by the time of the August 2002 trial date.

[4] Mother had retained different counsel by the time of trial.

the return of the down payment, his closing costs, and the other cash he had invested in the home. He said he and Mother had no fixed agreement regarding the rent at the Beckwith Road residence, but Mother would tell him whenever she needed money, and he would give her cash. He denied threatening Mother or telling a counselor that he would not pay the Quarry Road house note unless Mother gave him custody of the child. He also denied kicking in the bathroom door or intentionally punching a hole in the laundry room wall, testifying that Mother had slammed the bathroom door on his foot, causing it to pop from the hinges, and he had accidentally hit the wall with his hand.

Father was unable to produce a valid driver's license at the December 7, 2001, deposition, but at the August 8, 2002, trial date, produced one issued on December 11, 2001, as well as one issued on August 21, 2001. He testified his license had previously been suspended, but through no fault of his own. In essence, Father claimed that he had been the victim of identity theft at the hands of his now deceased brother-in-law and/or others, who had stolen his driver's license and social security number, and had been arrested and convicted under his name in Tennessee and other states. In partial support of this claim, Father introduced the testimony of Officer James Johnson of the Metro Nashville Police Department's Criminal Warrants Division, who testified he had twice served Father with warrants relating to fraudulent checks written in Father's name, but both times the judge had instructed him to release Father, stating that the warrants were a mistake. Officer Johnson testified his understanding was that a man, who was now deceased, had forged Father's name on the checks.

Father testified at the August 2002 trial that American Manufacturing Systems was no longer in operation and that he currently earned his living by working for himself as a mechanical design engineer and by buying and refurbishing old houses and cars to sell for profit. He said he had recently bought a house at an auction, for which he already had a buyer. When asked by the trial court where he intended to live with the child, he said he would purchase another house. Father estimated he had earned approximately $70,000 thus far that year. He had not yet filed his 2001 tax return; however, he anticipated it would reveal a net loss in excess of $100,000. Father said he had been audited by the Internal Revenue Service six to eight times since he was nineteen, was currently being audited on the 2000 tax return, and anticipated being audited on the 2001 return as well. He acknowledged he was named as a defendant in several pending lawsuits and had one or two outstanding judgments against him.

Father produced a social security card at the August 2002 trial which reflected a different number from the one listed on the marriage license issued to him and Mother. He denied the signature on the marriage license was his and claimed he did not recognize the social security number and had not provided it to the clerk. He did, however, admit having used a different social security number in the past, testifying both that he had mistakenly used a number he had thought was his, and that his first social security number had been stolen and fraudulently used by someone else:

> Q. You haven't used any other Social Security numbers in the past, "yes" or "no"?

A.     I have used a Social Security number that I was informed was my Social Security number at the time I was 16 years old. It was found out that that was incorrect. Someone tried to obtain a license in my name and an altered -- in the state of Florida a wrong Social Security number, wrong ID. And I was pulled over, stopped and arrested four years later because they just happened to have a capias on me in the state of Florida.

Q.     So you were arrested in the state of Florida, or Tennessee?

A.     Arrested in Tennessee. And I was released and those charges were dismissed and removed from my record.

Q.     Okay. Now I'll ask the same question again. Have you ever used a different Social Security number than the one we made a copy of and entered into the record? Have you –

A.     Have I used one intentionally? No.

Q.     That's not my question, sir.

A.     No. Have I ever? Yes, I have used a Social Security number that I was told was mine, and I did have a Social Security card issued to me upon that date, and it has been changed since.

Q.     Okay. Why was a different Social Security card issued to you?

A.     Because of the fraud that was done on me and all, they've given me another Social Security number so my tax problems and everything, they know exactly who I am.

Q.     Was your Social Security number stolen and used by someone else, you say?

A.     Yes.

Q.     Okay. Who was that person?

A.     We don't know all of them. We don't know. It goes from Florida, Georgia, California, places I've never been, including, I don't know, credit. I had to get my credit cleaned up because I found out

one day I bought a house load of furniture in Florida in a store, and I've never lived in Florida.

Q.    You've had tough luck with driver's licenses and Social Security numbers, haven't you?

A.    No, I haven't. Someone else has used them and improperly, and now I'm getting it straight. It takes a lot of money. And I'm going to see every judge in every county in every state.

Father testified that he and Mother shared the cooking and cleaning duties during the time they lived together and that he participated in bathing and feeding the child. He also pointed out that the child spent the entire day with him at his shop while Mother worked. He said that the child was closely bonded with him and requested that the trial court award him full custody, or, in the alternative, joint custody with Mother.

Eleanor Drake Bunch, a pediatric behavior specialist, testified that she met with Father three times, with the second and third sessions, which lasted forty-five minutes and one hour, respectively, including the child. She found Father "very gentle and genuine" and the child "very happy" with Father. She testified the child was strongly bonded with Father:

> I found him very attached to [Father] in a positive way. You know, when he would walk off from him or just take a few steps, you know, Christopher would start to cry. And that was his communication to his father to say come back here, you know, I want you to be close to me. Which is a sign of the nurturer, usually seen with the mother and not of the father, but he is much more attached to [Father], more like a mother figure than as a father figure.

Mother presented two witnesses to attest to her parenting skills: Reverend Adrian Jones, the pastor of the United Methodist Church of which she was a member, and Joyce Anderson, a fellow church member and longtime friend of Mother's. Reverend Jones testified that Mother had regularly attended church with her children during the two years he had served as pastor, and described her interactions with the children as "very loving," "tender," and "helpful." He testified that she guided and directed the children in their attendance at children's events and that the two older boys helped Mother care for and watch the younger child. He acknowledged Father had attended church with the family in the past and that he had not seen anything to indicate he was not a good father to the child. Anderson testified that Mother had attended the church for the past fifteen to twenty years and described her as a "loving, caring parent." She said the two older boys, who helped with the younger child, appeared to love him "to pieces" and that he appeared to feel the same way about them.

Stephanie Denise King, a research analyst with Abernathy Surveillance Equipment, Inc., testified Mother retained her firm to conduct a background check on Father. As part of her report,

which was admitted as an exhibit at trial, she compiled certified copies of Father's driver's license applications, arrest warrants, citations, motor vehicle reports, indictments, and the civil complaints filed against him. She testified her research revealed that Father used one social security number when applying for a driver's license on August 21, 2001, and a different social security number when applying for a license on December 11, 2001. The August application, marked as a license for identification only, contained a handwritten notation stating that possible fraud was involved, and King learned that the social security number Father used in that application belonged to his father. She said Father was issued a driver's license in 1987, which was revoked in 1988 for a traffic violation and reinstated in 1989. The license was again revoked in 1991 and was not reinstated until 2001. Father's official driving record, which revealed activity for the previous seven years, contained thirteen separate entries ranging from Father's involvement in an accident involving personal injury in 1998, to his numerous arrests or citations for driving on a revoked license, speeding, failing to file insurance following a conviction or suspension notice, and driving with the wrong license for the type vehicle. King additionally discovered that Father had been charged in 1990 with two counts of reckless endangerment and one count of disorderly conduct, in 1992 with passing a worthless check, in 1995 with criminal impersonation and filing a false police report, and in 1999 with allowing a person under the age of twelve to operate a boat.

On September 17, 2002, the trial court entered a final order in the case, awarding Mother primary custody but granting Father broad visitation rights of every other weekend, alternate holidays, the week between Christmas and New Year's, and three nonconsecutive weeks during the summer. The trial court ordered Father to pay child support in the amount of $361 per month, finding his testimony about his current level of income to be incredible. The court found there was no equity in the Quarry Road property and awarded it to Mother, denying Father's request for the return of his down payment and other costs. Father subsequently filed a motion to modify, alter, or amend the final judgment, requesting a joint custody arrangement for the child and the return of the money he had paid toward the purchase of the home, less any amount that the court determined he owed Mother. The trial court denied the motion, and Father appealed.

## ANALYSIS

Father argues on appeal that the trial court erred in awarding Mother primary custody of the child and in failing to award him the return of his down payment and other funds invested in the property. He contends that a consideration of the factors listed in Tennessee Code Annotated section 36-6-106 suggests he is the comparatively more fit parent, and he asserts that Mother's own testimony established there was at least $30,000 equity in the property, from which the trial court should have reimbursed him for the funds he provided toward its purchase.

Because this case was heard by the trial court sitting without a jury, we review these issues *de novo* on the record with a presumption of correctness given to the trial court's factual findings, unless the evidence preponderates against them. See Tenn. R. App. P. 13(d). We review the trial court's conclusions of law *de novo*, without any presumption of correctness. See Ridings v. Ralph M. Parsons Co., 914 S.W.2d 79, 80 (Tenn. 1996).

## A. Child Custody

We first consider Father's argument that the evidence showed him to be comparatively more fit to have custody of the child. Tennessee Code Annotated section 36-6-101 provides that a trial court should determine the custody of a child "as the welfare and interest of the child . . . may demand," and that "the court shall have the widest discretion to order a custody arrangement that is in the best interest of the child." Tenn. Code Ann. § 36-6-101(a)(1) & (2) (2001). "The paramount concern in child custody cases is the best interest of the child." Bah v. Bah, 668 S.W.2d 663, 666 (Tenn. Ct. App. 1983). This determination necessarily depends on the facts of each case. See Koch v. Koch, 874 S.W.2d 571, 575 (Tenn. Ct. App. 1993). Tennessee Code Annotated section 36-6-106(a) provides that, in determining custody, a trial court shall consider all relevant factors, including, where applicable, the following:

(1) The love, affection and emotional ties existing between the parents and child;

(2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been a primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment . . .;

(4) The stability of the family unit of the parents;

(5) The mental and physical health of the parents;

(6) The home, school and community record of the child;

(7) The reasonable preference of the child if twelve (12) years of age or older. . . . ;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person . . . ;

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing

parent-child relationship between the child and the other parent, consistent with the best interest of the child.

Tenn. Code Ann. § 36-6-106(a) (2001).

When addressing the issue of child custody, we recognize that "[c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the . . . proceedings themselves." Gaskill v. Gaskill, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996). Because the trial court is in the best position to evaluate the parties' credibility, "appellate courts are reluctant to second-guess trial judges who have observed the witnesses and assessed their credibility." Adelsperger v. Adelsperger, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997) (citing Gilliam v. Gilliam, 776 S.W.2d 81, 84 (Tenn. Ct. App. 1988)).

In making its child custody determination, the trial court specifically found that Father was not credible and that it would be in the child's best interest to be placed with Mother:

> THE COURT: All right. It's your story and you're sticking to it.
>
> I've made my decision. Officer Driver (phonetic)?
>
> OFFICER DRIVER: Yes, ma'am?
>
> THE COURT: Please stand next to Mr. Fuller, and if he opens his mouth one more time, you can handcuff him.
>
> OFFICER DRIVER: Okay.
>
> THE COURT: Mr. Fuller, I think you're really trying to be a good dad, but you're just not honest with the Court. For your son's sake, you need a big lesson in honesty.
>
> Now, I wasn't thrilled with Ms. Nicholson's testimony last time. I found some problems with some things she's doing; but she's still trying to bring these three boys up. She's doing the right thing. She's taking them to church on Sunday and trying to teach these children morals. Yes, she fails sometimes; and yes, you fail. But you've done -- and I don't want you to give up on Christopher. I just think Christopher needs –
>
> He's not going to listen. For the record, he's not going to listen –

MR. FULLER: Yes, ma'am.

THE COURT: – based on the shuffled papers and doing anything he can to avoid it.

So I'm awarding Ms. Janie Nicholson primary custody. I find it to be in Christopher Tyler Fuller's best interests that his mom be awarded primary custody.

We conclude that the evidence does not preponderate against the trial court's findings. Mother conceded at trial that Father could be a good father at times. It was undisputed that Father cared for the child at his shop while Mother worked and that the child was attached to Father. However, it was also undisputed that Mother cared for and loved the child as well. Mother's witnesses testified that Mother was a loving and tender parent and that the child had a close relationship with his two older siblings, Mother's children from a previous relationship. Notably, the pediatric behavior specialist who testified on Father's behalf regarding the close bond exhibited between Father and the child did not witness Mother's interactions with the child. While Mother appears from the record to have expensive habits and to exhibit poor judgment with personal finances, she also appears to have the more lucrative work history of the two parties and the more stable home environment. Moreover, while Mother's behavior is far from blameless, in that she violated the trial court's orders granting Father emergency temporary custody and restraining her from encumbering the property, her record pales in comparison with Father's, whose substantial criminal history includes numerous arrests, citations, and warrants for offenses ranging from speeding and driving on a revoked driver's license to reckless endangerment and criminal impersonation. Under these circumstances, and according due deference to the trial court's credibility determinations, we cannot conclude that the evidence preponderates against the trial court's award of primary custody to Mother.

## B. Father's Interest in Quarry Road Property

Father also argues that the trial court erred in finding there was no equity in the Quarry Road property and in denying his request for the return of his down payment, closing costs, and interest payment, less any amount he owed Mother. Mother argues that the evidence does not preponderate against the trial court's finding that there was no equity in the property. She further argues that the law does not support Father's claim of interest in the property because the parties were never married and the property was titled in Mother's name alone. She asserts that Father "clearly made a voluntary gift" to her of the down payment and further contends that he is not entitled to any relief on this issue because he filed no action other than a petition for legitimation and custody.

As an initial matter, we note that Father filed a motion on February 6, 2002, in which he specifically requested the return of his investment in the Quarry Road property. Further, the trial court heard evidence and ruled on the issue at the final hearing. Accordingly, we conclude Father is entitled to raise the issue on appeal.

-12-

The trial court denied Father's request for the return of his down payment and other costs, finding that there was no equity in the property, that the amount Father paid as down payment would have only covered the interest on the loan for two years, and that "[Father] really doesn't want to pursue that claim." The evidence, however, preponderates against this finding. Mother owed approximately $213,000 on the property at the time of purchase. On June 25, 2001, in violation of the trial court's order, she obtained a $15,044 loan secured by a second deed of trust, which she then used to pay her personal credit card debt and attorneys' fees. She stated on her credit application, filed on June 13, 2001, that the property was valued at $260,000 at that time. Mother later refinanced the original $213,000 loan on the property, as well as the $15,044 loan, with a standard thirty-year mortgage in the amount of $245,000, at which time the property appraised for $275,000. Thus, there was clearly equity in the property.

It is undisputed that the parties were never married and that the property was titled in Mother's name alone. We, therefore, agree with Mother that the rules regarding the equitable division of marital property do not apply. We disagree, however, with her contention that Father intended to make a gift to her of the down payment and closing costs. The testimony of both parties establishes that, at the time the purchase was made, they had every intention of marrying. By Mother's own admission, the parties looked at other property together prior to the Quarry Road property's becoming available at auction, discussed beforehand whether to bid on the property and the price they were willing to pay, and attended the auction together. Obviously, Father paid the down payment and closing costs under the assumption that he would be living in the home together with Mother, Christopher, and Mother's two children from a previous relationship, as part of one family.

Tennessee has long recognized claims based on the doctrine of unjust enrichment. Paschall's, Inc. v. Dozier, 407 S.W.2d 150, 154 (Tenn. 1966); see also Whitehaven Cmty. Baptist Church v. Holloway, 973 S.W.2d 592, 596 (Tenn. 1998) (stating that "[u]njust enrichment is a quasi-contractual theory or is a contract implied-in-law in which a court may impose a contractual obligation on the parties where one does not exist"). In order to establish a claim based on unjust enrichment, a plaintiff must show (1) a benefit has been conferred upon the defendant by the plaintiff; (2) the defendant appreciated the benefit; and (3) acceptance of the benefit under the circumstances would make it inequitable for the defendant to retain the benefit without paying the value of the benefit. Paschall's, 407 S.W.2d at 155. "The most significant requirement for a recovery on quasi contract is that the enrichment to the defendant be unjust." Id. Each claim of unjust enrichment must be decided on a case by case basis. B & L Corp. v. Thomas & Thorngren, Inc., 917 S.W.2d 674, 680 (Tenn. Ct. App. 1995).

Father paid the down payment and closing costs with the expectation of marrying Mother and living in the home together. Mother benefitted by having those costs paid for her, without which she would have been unable to purchase the property. She enjoyed that benefit by having a home for her family to live in, as well as sufficient equity to enable her to obtain the $15,044 loan, with which she paid her personal credit card debt and attorneys' fees. Under these circumstances, it would be inequitable for Mother to retain both the property and the funds Father paid toward its purchase.

Therefore, we conclude that Father is entitled to the reimbursement of the down payment and closing costs he provided, less any money he owes Mother.

Whether Father owed Mother for unpaid rent at the Beckwith property or for the horse which allegedly died under his care was disputed at trial, and the trial court made no determination on these issues. Similarly, the trial court made no finding on whether Father owed Mother for the June house payment and penalties, as unpaid rent during the time he lived with her at the Quarry Road property. Therefore, we remand the case to the trial court to determine what amount, if any, should be deducted from the amount Mother owes Father for the down payment and closing costs.

## C. Mother's Attorney's Fees

Mother argues that the trial court erred in denying her attorney's fees in the action and asks this court to remand to the trial court for a determination of her reasonable attorney's fees. She additionally requests that this court award her reasonable attorney's fees incurred on appeal. Tennessee Code Annotated section 36-5-103(c) provides that "the spouse or other person to whom the custody of the child . . . is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody . . . ." Tenn. Code Ann. § 36-5-103(c) (2001). However, "[t]he allowance of attorney's fees is largely in the discretion of the trial court, and the appellate court will not interfere except upon a clear showing of an abuse of that discretion." Aaron v. Aaron, 909 S.W.2d 408, 411 (Tenn. 1995). We find no abuse of discretion in the trial court's ordering each party to be responsible for his or her own attorney's fees. Furthermore, we do not find it appropriate in this case to award Mother her attorney's fees incurred on appeal.

## CONCLUSION

We affirm the trial court's award of primary custody to Mother and its denial of Mother's request for attorney's fees. We reverse the trial court's denial of Father's request for the return of his down payment and closing costs, and remand to the trial court for a determination of the exact amount of money, if any, Father owes Mother for unpaid rent and for her horse. Costs of the appeal are taxed equally to Mother and Father.

_____
ALAN E. GLENN, SPECIAL JUDGE

-14-